**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

| | | |
|---|---|---|
| FRATERNAL ORDER OF POLICE FORT PITT LODGE NO. 1, | : | No. 9 WAP 2018 |
| | : | |
| | : | Appeal from the Order of the |
| Appellant | : | Commonwealth Court entered on |
| | : | 7/17/17 at No. 1429 CD 2016, quashing |
| | : | the appeal from the arbitration award |
| | : | entered 7/27/16 at Case No. 01-14- |
| v. | : | 00001-3292-2-RB |
| | : | |
| CITY OF PITTSBURGH, | : | |
| | : | |
| Appellee | : | ARGUED:  October 24, 2018 |

## *OPINION*

**CHIEF JUSTICE SAYLOR**                    **DECIDED: FEBRUARY 26, 2019**

In this appeal by allowance we consider whether a police-union interest arbitration award deviates from a municipal financial recovery plan so as to permit a direct appeal of that award in the Commonwealth Court.

In 2003, the state Department of Community and Economic Development ("DCED") designated the City of Pittsburgh as a financially distressed municipality under the Municipal Financial Recovery Act ("Act 47").[1]  As part of the Act 47 rehabilitation process, DCED appointed a recovery coordinator, *see* 53 P.S. §11701.221, and the City implemented several recovery plans.  The most recent of these, known as the Second Amended Recovery Plan (the "Plan"), was adopted in mid-2014 to address, *inter alia*, the City's legacy costs – including pension fund liability, debt, and operational deficit –

---

[1] Act of July 10, 1987, P.L. 246, No. 47 (as amended 53 P.S. §§11701.101-11701.712).

as well as the need for greater infrastructure spending. The City was spending 90% of its budget on salaries, benefits, and debt servicing, leaving only $50 million for other expenses such as costs relating to police vehicles, municipal building utilities, fuel, training, contracting, and day-to-day operations.

In the Employee Overview section, the Plan notes that the City had 3,161 employees as of March 2014, distributed among nine unions and an unrepresented employee group. See Plan at 57.[2] After listing the number of employees in each group, the Plan states:

> While Pittsburgh has controlled workforce cost growth since entering into Act 47, *the City has also been able to maintain competitive, quality wages and benefits*. For example, . . . Pittsburgh public safety wages remain well within the mainstream among other larger Pennsylvania municipalities and other regional, mid-sized cities (Baltimore and Cleveland) – generally paying above the median by the latter years of a career (on which pension benefit formulas are typically based).

Plan at 58 (emphasis added).

In terms of initiatives, the Plan includes certain workforce goals in an effort to "better secure Pittsburgh's financial health and sustainability." *Id.* at 71. One of these, labeled "WF01," relates to "[m]aximum compensation allocations and costing analysis," and indicates that its target outcome is "[m]aintaining budget stability and competitive compensation." *Id.* WF01 includes tables with the maximum dollar values available for each bargaining unit on a yearly basis from 2015 to 2018. One such table includes a row for "FOP," *i.e.*, the police union, which reflects maximum police-force allocations ranging from approximately $83 million in 2015 to about $90 million in 2018. *See id.* at

---

[2] The 2014 Plan was originally filed with the Pittsburgh city clerk on May 30, 2014. That version is attached as an appendix to Appellant's brief. A revised Plan was filed on June 24, 2014, and is included in the reproduced record. The page numbers given here refer to this latter version.

72. WF01 states that, in developing these allocations, the Act 47 coordinator estimated that yearly increases would be limited as follows:

> Year 1 – No Across-the-Board Increase
> Year 2 – 1.0%
> Year 3 – 2.0%
> Year 4 – 2.0%
> Year 5 and beyond – 2.0%

*See id.* at 73. It also emphasizes that, "given the City's severe underfunding of retiree benefits and associated sustainability risk," "any improvement to retiree benefits that would add to these already daunting burdens" should be avoided. *Id.* at 72.

The City's collective bargaining agreement ("CBA") with Appellant Fraternal Order of Police Fort Pitt Lodge No. 1 (the "Union") expired on December 31, 2014. As the parties were unable to reach consensus on a new CBA, they entered into interest arbitration governed by the Policemen and Firemen Collective Bargaining Act ("Act 111").[3] *See* 43 P.S. §217.4. After an evidentiary hearing encompassing ten days of testimony before an Act 111 arbitration panel, the panel issued a final award covering years 2015-2018. *See In re Interest Arb., Fraternal Order of Police, Fort Pitt, Lodge No. 1 and City of Pittsburgh*, No. 01-14-0001-3292-2-RB, Interest Arb. Award (Am. Arb. Ass'n July 25, 2016) (the "Award"). The Award contains numbered factual findings and a summary paragraph, followed by the terms of the award itself.

One such factual determination includes a list of itemized findings relating to the City's population, income, housing vacancy rate, and, most relevantly, the City's police officer compensation as measured against other economically and demographically

---

[3] Act of June 24, 1968, P.L. 237, No. 111 (codified at 43 P.S. §§217.1-217.10). Act 111 gives police and fire personnel, who are not permitted to strike, the right to bargain collectively with their public employers. *See* 43 P.S. §217.1. *See generally Pa. State Police v. Pa State Troopers Ass'n (Smith)*, 559 Pa. 586, 591-92, 741 A.2d 1248, 1251-52 (1999).

comparable subdivisions. These findings initially provide some background information, such as that the City has lost half its population since the 1950s, its existing population is aging, and with 306,000 residents, there is no other similarly-sized Pennsylvania community. *See* Award at 7-8, Finding of Fact ("FOF") 81.[4]

As for police compensation in the City and other economically and/or demographically comparable communities in the Commonwealth, FOF 81 indicates, among other things, that: the City's fifth-year police officer base salary rate in 2014 was $60,722; of the comparable communities selected by the City, fifth-year police officer base salaries ranged from $37,201 to $67,121; sixty-five percent of all the Union's members earned over $80,000 in 2014; twenty-five percent of all the Union's members earned over $100,000 in 2014; the average gross wage of a Pittsburgh police officer in 2014 was $84,395; the Union's financial expert had testified in a prior matter in 2014 that the City's police pay was above the median of a comparison group; the City's police officers pay substantially lower contributions toward health insurance than other City employees for the same coverage level; and the Union's own financial expert believes City police officers are paid competitively. *See* Award at 8-9, FOF 81. The concluding paragraph relative to the factual findings states:

> Based on its review of the evidence, a majority of the panel has determined that the workforce allocations contained in the [Plan] are not arbitrary, capricious or established in bad faith.

*Id.* at 9. The Award's substantive terms include a provision covering yearly base wage increases for full-time police officers, as follows:

---

[4] The Award also notes that the cities in Pennsylvania closest in size to Pittsburgh are Allentown and Erie, with populations of 118,000 and 101,000, respectively. It observes, as well, that Cincinnati and Cleveland have closer populations, namely, 297,000 and 394,000, respectively. It continues that these latter two cities, as well as Baltimore and Detroit, have all experienced significant population loss. *See id.*

Effective 1/1/15   0.0%
Effective 1/1/16   1.0%
Effective 1/1/17   2.0%
Effective 1/1/18   2.0%

Award at 12, ¶10.

The Union filed an appeal in the Commonwealth Court, contending that the Award deviates from the Plan by failing to ensure competitive compensation for police officers as required by the Plan. The Union argued that the court had jurisdiction to rule on its appeal per Section 252(e) of Act 47. Section 252(e) provides for such jurisdiction in certain scenarios when an Act 111 arbitration settlement deviates from the governing recovery plan:

> **(e)   Appeal.**--The distressed municipality, collective bargaining organization and the coordinator or secretary have the right to appeal to Commonwealth Court from an arbitration settlement which deviates from the plan under subsection (b).

53 P.S. §11701.252(e). In turn, subsection 252(b), provides:

> **(b) Arbitration settlements for policemen and firemen.**--An arbitration settlement rendered under [Act 111] may deviate from the plan, but only if the arbitration settlement:
>
> (1) except as set forth in subsection (b.1), will not cause the distressed municipality to exceed any limits on expenditures for individual collective bargaining units imposed under the plan;[5]
>
> (2) will not further jeopardize the financial stability of the distressed municipality, as measured by the criteria set forth in section 201;[6] and

---

[5] Subsection (b.1) exempts this first prong where an expenditure limit for an individual bargaining unit is determined to be arbitrary, capricious, or established in bad faith. *See id.* §11701.252(b.1).

[6] Section 201 sets forth criteria for DCED to use in evaluating a municipality's fiscal stability. *See id.* §11701.201; *see also id.* §11701.121 (imposing on DCED a duty to undertake such evaluation in assessing if the municipality is financially distressed).

(3) is not inconsistent with the policy objectives set forth in section 102(a) to relieve the financial distress of the distressed municipality.[7]

*Id.* §11701.252(b).

The City filed a cross-appeal. In its filing, the City initially advanced that the Commonwealth Court lacked jurisdiction to entertain the Union's appeal because the Award did not deviate from the Plan as required to implicate Subsections 252(e) and (b), and signaled that it would file a motion to quash the Union's appeal on that basis. The City also included a substantive claim that the Award infringes upon its managerial responsibilities. The City explained, as well, that the parties had raised these same substantive issues in litigation before the Allegheny County Court of Common Pleas, which the Union had commenced contemporaneously with the present litigation. Thereafter, the City filed its motion to quash.

Having consolidated the appeals, the Commonwealth Court held, in a published decision, that it lacked jurisdiction under Section 252(e); accordingly, it granted the City's motion and quashed both appeals. *See Fraternal Order of Police Fort Pitt Lodge No. 1 v. City of Pittsburgh*, 167 A.3d 245, 251 (Pa. Cmwlth. 2017) (*en banc*). In reaching its holding, the court noted that the arbitration panel's stated intent was that

---

[7] Section 102(a) states:

It is hereby declared to be a public policy of the Commonwealth to foster fiscal integrity of municipalities so that they provide for the health, safety and welfare of their citizens; pay principal and interest on their debt obligations when due; meet financial obligations to their employees, vendors and suppliers; and provide for proper financial accounting procedures, budgeting and taxing practices. The failure of a municipality to do so is hereby determined to affect adversely the health, safety and welfare not only of the citizens of the municipality but also of other citizens in this Commonwealth.

*Id.* §11701.102(a).

the Award be applied consistently with the Plan, and that the Award's provision dealing with police-officer pay increases "directly adopts" the Plan's graduated yearly increases from 0.0% to 2.0% as set forth above. *Id.* at 250 (emphasis omitted).

Responding to the Union's argument that the Award did not provide competitive compensation for its members, the court noted that the WF01 initiative only mentions competitive compensation in a generalized, introductory fashion – stating that its overall target outcome is to maintain stability and competitive compensation – but then includes specific dollar amounts as maximum yearly increases. The court thus concluded that "there was no 'competitive compensation' requirement mandating an *increase* in compensation from which the [arbitration panel] turned aside, diverged, or strayed in issuing the Award." *Id.* (emphasis in original); *see also id.* at 250 n.10.

Finally, the court rejected the Union's argument that the arbitration panel should not have relied on the workforce allocations given in the Plan because they were arbitrary, capricious, or established in bad faith. The court viewed the Union's objection in this respect as directed to the dollar figures in the Plan, and not the Award. That being the case, the court concluded, the Union could not demonstrate that the Award fell within the "narrow category of direct appeals authorized by Section 252(e)," and hence, any challenge to the Award should be resolved via the ordinary review process in the common pleas court. *Id.* at 251.

Judge Cosgrove dissented, expressing that the Plan made the maintenance of competitive pay a prerequisite in determining police officer compensation. In his view, the Union's allegation that the Award failed to supply competitive wages implicated a sufficient deviation to invoke direct appellate jurisdiction under Section 252, particularly as the General Assembly has sought in recent years to broaden the bases for jurisdiction in the Commonwealth Court under that provision. *See id.* at 252.

We granted allocatur to evaluate whether the Commonwealth Court correctly determined that it lacked appellate jurisdiction under Section 252 of Act 47. *See Fraternal Order of Police Fort Pitt Lodge No. 1 v. City of Pittsburgh*, ___ Pa. ___, 182 A.3d 444 (2018) (*per curiam*).

By way of background, Section 252 originally consisted of a single sentence providing:

> A collective bargaining agreement or arbitration settlement executed after the adoption of a plan shall not in any manner violate, expand or diminish its provisions.

53 P.S. §11701.252 (1987).

In *City of Scranton v. Firefighters Local Union No. 60*, 612 Pa. 23, 29 A.3d 773, (2011), this Court found the above use of the term "arbitration settlement" ambiguous as to whether it applied to arbitration "awards," *see id.* at 45-46, 29 A.3d at 787, and ultimately held that it did not encompass Act 111 awards – thus allowing such awards to deviate from a governing Act 47 plan. *See id.* at 50, 29 A.3d at 789. The General Assembly then amended Act 47 by clarifying that "arbitration settlement" includes both collective bargaining agreements and binding arbitration awards or determinations, *see* Act of July 5, 2012, P.L. 1104, No. 133, at §1; placing Section 252's general non-deviation rule into a newly-created subsection (a), *see id.* §3; limiting subsection (a) by making it subject to an exception set forth in a new subsection (b), *see id.*; and adding five subsections (including subsection (b)), exclusively governing Act 111 arbitration settlements which deviate from the existing act 47 plan (hereinafter, "deviating arbitration settlements"). *See id.*

As such, Section 252 now consists of six subsections, only the last of which pertains to review in the Commonwealth Court. Subsection (a), as noted, sets forth a general rule against deviating from an existing Act 47 plan, other than as provided for in

subsection (b). The remaining subsections – other than subsection (e) – are primarily concerned with the circumstances under which an Act 111 arbitration award may so deviate, as well as the manner in which a determination is made as to whether a deviation exists.

Thus, and as quoted above: subsection (b) enumerates three conditions that must be satisfied to permit deviation, with the proviso, set forth in subsection (b.1), *see supra* note 5, that the first condition – not causing a municipality to exceed individual bargaining-unit expenditure limits – need not be met if those limits are determined to be arbitrary, capricious, or established in bad faith, *see id*. §11701.252(b), (b.1); subsection (c) indicates that, where a deviating arbitration settlement has been rendered, the question of whether the conditions in subsection (b) are satisfied is to be determined by the Act 111 arbitration panel and reflected in factual findings supported by substantial evidence, including the credible testimony of an expert in municipal finance, *see id*. §11701.252(c); and subsection (d) requires that the chairperson of the arbitration panel provide any deviating arbitration settlement to the Act 47 coordinator so that the latter can independently determine "whether it violates this section." *Id*. §11701.252(d). This is presumably required so that the coordinator, if aggrieved by the deviation, can seek relief directly in the Commonwealth Court per subsection (e).

As for subsection (e), which is at the heart of this dispute, that provision gives certain parties – namely, the municipality, the union, the Act 47 coordinator, and the DCED secretary – a right of appeal to the Commonwealth Court from deviating arbitration settlements. *See id*. §11701.252(e). Subsection (e) also contains subsidiary paragraphs relating to the timing of the appeal, the record on appeal, the standard of appellate review, and the standard for setting aside an Act 47 plan's bargaining-unit expenditure limits. For example, review in the Commonwealth Court is undertaken *de*

*novo* – meaning that the court "shall not be bound by the factual or legal conclusions of the board of arbitration, *id.* §11701.252(e)(3) – and the court can supplement the record. *See id.* §11701.252(e)(2). This contrasts notably with the highly deferential narrow-certiorari standard of review ordinarily applicable to Act 111 awards. Under that framework, courts only consider the jurisdiction and authority of the arbitrator, the regularity of the proceedings, and whether any constitutional rights have been violated. *See, e.g.*, *Borough of Ellwood City v. Ellwood City Police Dep't Wage & Policy Unit*, 573 Pa. 353, 359-60, 825 A.2d 617, 621 (2003). Finally, subsection (e) specifies that the Act 47 plan's limits on expenditures for an individual collective bargaining unit can only be disturbed on appeal if the limit is arbitrary, capricious, or established in bad faith. *See id.* §11701.252(e)(4).

Presently, the Union renews its argument that jurisdiction was proper in the Commonwealth Court because the Award deviates from the Plan by failing to provide competitive compensation for its members. It acknowledges that, under Section 252, the question of whether any such deviation is permissible under subsection (b) is to be determined by the arbitration panel itself pursuant to subsection (c). In this latter respect, however, the Union faults the Award for simply reciting that the Union's financial expert believes that City officers are paid competitively, and as such, failing to acknowledge the alleged deviation or demonstrating that the deviation complied with the conditions set forth in subsection 252(b).

The Union does not deny that its financial expert holds this view, but it indicates that such conclusion overlooks meaningful evidence presented during the arbitration hearing that the City's police officers are, in fact, not being paid competitively with other municipalities, and that their salaries are not keeping pace with inflation over the long term. The Union contends that, as a result of these factors, the City's police force has

suffered from attrition, as officers, particularly those with less than five years' experience, leave to work for other police departments in Allegheny County or elsewhere in Pennsylvania.  *See* Brief for Appellant at 31.

The Union also argues that the Plan's expenditure limits are arbitrary, capricious, and established in bad faith.  It recognizes that the Award reflects an assertion to the contrary by a majority of the arbitration panel, but it discounts the assertion as being unsupported by the record, particularly in view of:  the City's alleged financial health; the inability of the Act 47 coordinator to defend the Plan's limits; the allegedly faulty factual basis on which the coordinator based the limits; and the coordinator's alleged bad faith in setting them.  *See id.* at 35-43.  The Union thus concludes that the Commonwealth Court erred in quashing its appeal.

The above advocacy includes two essential claims:  that the Award deviates from the Plan by failing to provide for competitive compensation, and that the maximum allocations set forth in the Plan are arbitrary, capricious, and established in bad faith.

The first of these assertions rests on the premise that WF01's stated aims of maintaining budget stability and competitive compensation, *see* Plan at 71, override the specific maximum allocations as reflected in the initiative's tables.  *See id.* at 72.  The Union posits, in other words, that the Award deviates from the Plan by *failing to deviate* from the Plan's maximum dollar allocations as given in WF01 because, in the Union's view, those allocations are insufficient to ensure that the second of these objectives – maintaining competitive compensation – is satisfied in relation to its members.

We believe it would be tenuous to interpret the Plan in this way.  WF01 as a whole is labeled "Maximum compensation allocations and costing analysis," which supports the concept that the tables of maximum allocations are intended to reflect actual limitations, and not merely provisional or suggested ones which can be

supplanted in service of a separate, competitive-compensation mandate, while maintaining consistency with the Plan's substantive terms. In this regard, WF01's target outcomes as mentioned above are followed almost immediately by the table of maximum yearly allocations for each bargaining unit, indicating that the Plan envisions those limits as constituting a means of achieving the stated objectives. Further, there is no indication in WF01 or anywhere else in the Plan that such maximum allocations are subordinate to a determination that they are insufficient to maintain salary competitiveness. Finally, after the tables of maximum allocations, the Plan expresses concern about adding to the cost of retiree benefits (which would be increased with increased salaries) – and, more particularly, it clarifies that the given allocations should not be disregarded, stating:

> For represented employees, the City and their respective bargaining units may agree to spend the allocation on various compensation components as they mutually determine to be appropriate . . .. However, *in no case shall the requirements otherwise set forth exceed the annual maximum allocations in the chart above.*

Plan at 72 (emphasis added).

We acknowledge that the Union strenuously argues police officer compensation under the Award is too low to be competitive with other police departments. *See* Brief for Appellant at 28-29. Its position in this respect, however, ultimately reflects a disagreement with substantive content of the Plan. As such, it cannot form the basis for a determination that the Award, by adopting the salary increases in the Plan, deviates from the Plan for purposes of Section 252(e).[8]

---

[8] WF01 clarifies that the yearly percentage salary increases are estimates of what is needed for the City to stay within the allocation caps. *See* Plan at 73. The Union does not challenge these estimates or otherwise contend that the allocation caps can be maintained with larger annual salary increases than those appearing in the Plan.

We therefore agree with the Commonwealth Court that the Award does not deviate from the Plan so as to trigger jurisdiction under Section 252(e).[9]

The Union's alternative contention is that WF01's maximum allocations are arbitrary, capricious, and established in bad faith. Relief is unavailable on this second claim, however, as it does not pertain to an alleged deviation between the Award and the Plan. Notably, subsection (e) is part of the group of provisions that were added to Section 252 by the 2012 legislation to permit judicial review of deviating Act 111 arbitration settlements.[10] Within this context, paragraph 252(e)(4) does not itself confer standing to appeal directly to the Commonwealth Court. It merely establishes the standard for overturning an Act 47 coordinator's expenditure limits when an appeal is properly taken.

In this regard, paragraph (e)(4) falls under the general topic addressed in the introductory sentence to subsection (e). Such topic, quoted above, is expressly limited

---

[9] The Union also briefly maintains that, in light of the alleged deviation, the arbitration panel was required to demonstrate that all prerequisites listed in subsection (b) were satisfied, which the panel failed to do. *See* Brief for Appellant at 32-33. As we have determined that there was no deviation, we do not address this argument.

[10] The City offers its perspective that

> [t]his statutory change permitted the parties to develop an alternate wage and benefit package for bargaining unit employees, provided that [it] met the criteria in Section 252(b)(1)-(3). For example, a bargaining unit could decide . . . that it was willing for employees to pay more toward health insurance benefits so that the employees would receive greater increases in pay. This . . . was one of the objectives of the [2012] amendments: to authorize the Act 111 board of arbitrators to issue an award that deviates from the municipality's Act 47 plan, so long as the basic purposes for why an Act 47 plan exists – namely, improving the municipality's financial stability – are not adversely affected.

Brief for Appellee at 34.

to situations in which an arbitration settlement deviates from the existing plan. *See* 53 P.S. §11701.252(e). Even where a deviating arbitration settlement is issued, the statute vests the Act 111 arbitration panel with the task of ascertaining, in the first instance, whether an individual bargaining unit's expenditure limits are arbitrary, capricious, or established in bad faith. *See id.* §11701.252(c). Here, the panel stated the opposite – that it "ha[d] determined that the workforce allocations contained in the [Plan] are not arbitrary, capricious or established in bad faith." Award at 9.

We need not address whether, or under what standard, such a finding by the panel may be reversed by the Commonwealth Court when an appeal is properly taken. The point here is that nothing in the statute suggests that an allegation of error regarding a finding along these lines may be utilized to secure appellate jurisdiction in the Commonwealth Court where none is otherwise present. *Accord* Brief for Appellee at 17 (arguing that the Union "cannot mount a collateral attack on the [Plan] through [an] improper appeal of the Award.").

For the foregoing reasons, the Commonwealth Court properly held that the Union's challenge to the Award falls outside the scope of Section 252(e). Accordingly, that court's order quashing the parties' appeals is affirmed.

Justices Baer, Todd, Donohue, Dougherty, Wecht and Mundy join this opinion.