104 A.3d 1251

UNITED POLICE SOCIETY OF MT. LEBANON; Retired Police Officers; Mark Kubit, Mary Eichinger, John Michalec, David White, Les Palombine, Mary Sue Joyce, William Laurence, Kevin MacKen, Tom Gianni, Robert Gehrmann, Pat O'Donnell, and Blaise Larotonda,

v.

MT. LEBANON COMMISSION; Stephen M. Feller; Mt. Lebanon Pension Plan Administrator; Municipality of Mt. Lebanon.

Appeal of United Police Society of Mt. Lebanon.

United Police Society of Mt. Lebanon; Retired Police Officers; Mark Kubit, Mary Eichinger, John Michalec, David White, Les Palombine, Mary Sue Joyce, William Laurence, Kevin MacKen, Tom Gianni, Robert Gehrmann, Pat O'Donnell, and Blaise Larotonda,

v.

Mt. Lebanon Commission; Stephen M. Feller; Mt. Lebanon Pension Plan Administrator; Municipality of Mt. Lebanon.

Appeal of Les Palombine and Robert Gehrmann.

Supreme Court of Pennsylvania.

Argued April 8, 2014.

Decided Nov. 24, 2014.

Eric Carl Stoltenberg, Esq., Lightman Welby Stoltenberg & Caputo, Harrisburg, Ronald Ryan Retsch, Esq., for United Police Society of Mt. Lebanon.

Christian Charles Antkowiak, Esq., Joseph F. Quinn, Esq., Buchanan Ingersoll & Rooney, P.C., Pittsburgh, for Municipality of Mt. Lebanon, Mt. Lebanon Commission, Stephen M. Feller, Mt. Lebanon Pension Plan Administrator.

Ronald P. Koerner, Esq., for Les Palombine and Robert Gehrmann.

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, STEVENS, JJ.

## *OPINION*

PER CURIAM.

 Section 305(a) of the Municipal Pension Plan Funding Standard and Recovery Act ("Act 205")[1] requires a municipal-

---

[1]. Act of December 18, 1984, P.L. 1005, *as amended*, 53 P.S. §§ 895.101–895.803.

ity to obtain a complete and accurate cost estimate before the municipality adopts any benefit plan modification so as to have accurate information with respect to the plan's solvency. 53 P.S. § 895.305. The requirements of Act 205 apply notwithstanding any municipal ordinance, resolution, or agreement to the contrary. 53 P.S. § 895.301(a). At the same time, however, a municipal employer's unilateral change of a mandatory subject of bargaining, without first negotiating with the union, interferes with the employees' collective bargaining rights, and thus constitutes an unfair labor practice under the law known as Act 111.[2] *Borough of Ellwood City v. Pennsylvania Labor Relations Board*, 606 Pa. 356, 998 A.2d 589, 595 (2010) (*"Ellwood City v. PLRB "*).

This case concerns a conflict at the intersection of these two pillars of public labor law, caused here when a municipality submitted to the actuary making the cost study required by Act 205 *incomplete and/or inaccurate* information (although the municipality disputes this characterization). That information concerned a police pension plan term that the municipality had adopted pursuant to a collective bargaining agreement ("CBA"). Thereafter, the municipality administered the plan term along the lines of the incomplete or inaccurate assessment that resulted from the incomplete or inaccurate information submitted to the actuary, in effect unilaterally modifying both the plan and the CBA. The Commonwealth Court here ultimately determined that because Act 205 has statutory primacy over any CBA, the plan must be administered as understood by the actuary when it made its Act 205 cost study, even if this effectively alters a bargained-for term of the parties. We now reverse and remand.

The Mt. Lebanon Police Officer's Pension Plan ("Plan") provides for cost-of-living adjustments ("COLAs") to augment pension benefits for retirees. As originally agreed to for the

---

**2.** Act of June 24, 1968, P.L. 237, *as amended*, 43 P.S. §§ 217.1–217.10. Act 111 provides for collective bargaining by police officers with their public employers regarding the terms and conditions of their employment, including pensions and other benefits, and provides for proceeding to final and binding arbitration for resolution if there is a failure to reach an agreement.

Plan years 2000–03 ("2000 Plan") by the United Police Society of Mt. Lebanon ("Union") and the Municipality of Mt. Lebanon ("Municipality"), retired plan participants are eligible for yearly COLAs of 2% of the participant's final average monthly compensation until such time as the participant's benefits equal 90% of his or her final average monthly compensation. Section 4.09 of the Plan. This provision does not differentiate between regular retiree participants and early retiree participants. *Id.* In 2004, the COLA was changed for some early retirees, specifically those with fewer than 20 years of service, to reduce the benefit from 2% of the retiree's final average monthly compensation to 2% of the *actual early retirement benefits* ("2004 Plan"). However, no adjustment was made in the Plan with respect to the COLA cap of 90% of the participant's final average monthly compensation for any participant.

In 1999, the Municipality's Assistant Manager informed the actuary performing the cost estimate for the 2000 Plan that COLA payments to all participants would be capped at 15% in total increases, instead of informing the actuary that COLA payments would be capped at 90% of the participant's final average monthly compensation as specifically stated in Section 4.09 of the Plan. The Municipality's Assistant Manager apparently arrived at the 15% amount based on the difference between the base benefit of a *regular* retiree (75% of the regular retiree's final average monthly compensation) and the COLA cap of 90% of the retiree's final average monthly compensation, or 15%. The actuary's subsequent cost estimate regarding the financial health of the 2000 Plan (and thereafter, the 2004 Plan) was made based on the information provided by the Municipality's Assistant Manager; that is, the actuary applied a 15% COLA cap for both regular *and* early retirees. However, the base benefit of an early retiree's pension could be as low as 50% of the early retiree's final average monthly compensation. Moreover, after the 2004 amendments to the Plan, early retirees' COLA increases were linked not to their final average monthly compensation, but to their actual early retirement benefits.

In accordance with its interpretation of the Plan and the accompanying Act 205 actuarial cost estimate, the Municipality began capping COLA increases for early retirees at no more than 15% above the actual early retirement benefits; in some cases, this resulted in pension caps well below 90% of the retiree's final average monthly compensation as specified in Section 4.09 of the Plan. Subsequently, in 2006, the Union, thirteen retired officers, and a number of unspecified, active officers filed a grievance with the Plan Administrator concerning the Municipality's calculation of the duration of COLA benefits. On January 15, 2007, the Plan Administrator issued a "Notice of Denial" indicating that the claim was not ripe for review for the unspecified, active officers, and was untimely and, therefore, waived for the thirteen retired officers. On March 1, 2007, an appeal of the Notice of Denial was filed with the Mt. Lebanon Commission ("Commission") as the body designated by the Plan to hear appeals from decisions of the Plan Administrator pursuant to Section 8.08(c) of the Plan. The Commission affirmed the denials.

On appeal, the Allegheny County Court of Common Pleas ("trial court") concluded that the heart of the dispute was the method of calculating the maximum pension benefit for each officer pursuant to the COLA formula, and for this reason determined that the case was ripe. Accordingly, the trial court remanded the matter to the Commission to correctly calculate the COLA benefits before the court could address issues of timeliness.[3]

After hearing testimony and argument, the Commission issued a decision on February 8, 2011. The Commission posed the question before it as follows: should an early retiree be "treated *the same as a normal retiree;* that is, [he or she] should receive a COLA benefit up to a 15% maximum," or should "an early retiree receive [a] 2% COLA increase per year until the early retiree receives 90% of [his or her] Final Average Monthly Compensation." Findings and Conclusion of

---

**3.** Shortly thereafter, all retired officer appellants, except for Appellants herein, Les Palombine and Robert Gehrmann, settled with the Municipality.

[the Mt. Lebanon] Commission, dated 2/8/11 ("Commission Decision"), at 2, ¶ 7 (emphasis added). The Commission posed the question in this way based on its observation that a regular retiree's normal benefit is 75% of his or her final average monthly compensation, whereas an early retiree's benefit could be as low as 50% of his or her final average monthly compensation.[4] Using this circumstance as its touchstone, the Commission observed that if both regular and early retirees received COLA increases to up to 90% of their final average monthly compensations, a regular retiree's COLA increases could constitute no more than 15% of his or her final average monthly compensation, while an early retiree's COLA increases could potentially rise to as much as 40% of his or her final average monthly compensation, if that early retiree started at a baseline benefit of 50% of his or her final average monthly compensation. *Id.* at ¶¶ 4 and 7.

Ultimately, the Commission determined that it was "required to adopt the interpretation that the COLA is limited to a total of 15%" for both regular and early retirees. *Id.* at ¶ 8. This determination was based not on the above understanding of perceived unequal treatment of regular and early retirees, but rather on the following analysis: "State law [Act 205] requires that a cost study be performed before any plan amendment can be adopted, and the only cost study that was carried out in this case assumed that the COLA was limited to 15%. The Commission is not at liberty to adopt any other interpretation." *Id.* The Commission's conclusion that it was without liberty to reach a determination that was contrary to the Plan as understood by the Act 205 actuary when it made its cost study was, in turn, based on *Borough of Ellwood City v. Ellwood City Police Department Wage and Policy Unit,* 573 Pa. 353, 825 A.2d 617 (2003) ("*Ellwood City v. Police Department* "). In that case, we explained that because "the

4. The Commission's Decision sets forth the manner by which an early retirement benefit is calculated under the Plan. First, the retiree's normal retirement benefit is calculated. Then the number of months that the retiree needs to get to age 50 with 25 years of service is multiplied by .00555. The normal retirement benefit is then reduced by the product of such multiplication. Commission's Decision at 2, ¶ 6.

General Assembly has bounded bargaining over and modification of pension benefits by a requirement of actuarial soundness as contemplated by Act 205," the "power of the judiciary" is "constrained" from taking action that would interfere with any mandate found in Act 205. *Id.* at 623–24. The Commission ultimately concluded: "As there was only one cost study relative to the COLA provision of the Plan, the Commission is *bound to accept the interpretation of the COLA* that is consistent with the study." Commission's Decision at 7, ¶ 30 (emphasis added).

Although the Commission's determination was based on such a legal precept as understood by the Commission, several of its ancillary factual findings are also relevant to our inquiry, as they were to the other reviewing tribunals below. Relevantly, the Commission found that the Assistant Manager of the Municipality, Ms. Marcia Taylor, who was charged with administration of the Plan, was present and had participated in the 1999 negotiations with the Union that had resulted in the adoption of the COLA. It was she who had reported to Mockenhaupt Benefits Group ("Mockenhaupt"), the benefits consulting firm that performed the actuarial study of the Plan modifications adopted in 1999, that the COLA increases had a blanket 15% cap. Ms. Taylor reported this information in a good faith belief that this was how the COLA was to be implemented for all retirees. The 1999 negotiations did not include a separate discussion of how the COLA cap should apply to early retirees. Although the 2004 amendments to the Plan did specifically address COLA increases for early retirees, those amendments "did not address the issue in this case, i.e., how long an early retiree may receive the COLA." *Id.* at 5, ¶ 18. The Mockenhaupt cost study for the 2004 Plan amendments applied a 15% COLA cap to all retirees, as had the 1999 cost study.

Following the Commission's decision, the Union, Palombine, and Gehrmann appealed to the trial court, which reviewed the matter pursuant to the standard set forth in Section 754(b) of the Local Agency Law, 2 Pa.C.S. § 754(b).[5] Concluding that

5. Section 754(b) provides:

the Commission's decision was not in conformance with law and that certain necessary findings of fact were not supported by substantial evidence, the trial court reversed.

The trial court's conclusion that the Commission's decision lacked support in the law was based on the court's determination that Act 205 does not require the implementation of a pension plan based on mistaken or inaccurate information simply because that was the information supplied by the municipality to the actuary doing the Act 205 study. The court noted that there is no remedy set forth in Act 205 that would support this result; rather, the only remedy the court perceived in Act 205 was the authorization of a mandamus action when the municipality fails to meet its minimum funding for a pension plan. *See* 53 P.S. § 895.306. The court also noted that the plainly stated legislative intent of Act 205—and this remedy of mandamus—was to insure that municipal pension plans are not underfunded. *See* 53 P.S. § 895.306(a). The court then observed that there was no issue concerning the underfunding of the Plan before the Commission. The only issue before that body, as the court determined, was whether a municipality was relieved under Act 205 from implementing the plain language of its pension plan merely because it had provided incomplete information to the Act 205 actuary. The court concluded that Act 205 does not relieve the municipality from its obligations under a pension plan, where, as here, there was no evidence that the implementation of the plan would affect the plan's actuarial soundness. For

**(b) Complete record.**—In the event a full and complete record of the proceedings before the local agency was made, the court shall hear the appeal without a jury on the record certified by the agency. After hearing[,] the court shall affirm the adjudication unless it shall find that the adjudication is in violation of the constitutional rights of the appellant, or is not in accordance with law, or that the provisions of Subchapter B of Chapter 5 (relating to practice and procedure of local agencies) have been violated in the proceedings before the agency, or that any finding of fact made by the agency and necessary to support its adjudication is not supported by substantial evidence. If the adjudication is not affirmed, the court may enter any order authorized by 42 Pa.C.S. § 706 (relating to disposition of appeals). 2 Pa.C.S. § 754(b).

this reason, among others, the court disagreed with the Commission's reliance upon *Ellwood City v. Police Department.*

The trial court also concluded that there was not substantial evidence supporting the Commission's salient finding of fact that Ms. Taylor had "interpreted" the Plan, with respect to early retirees, in good faith. After quoting extensively from the record before the Commission, the court noted that Ms. Taylor had admitted in her testimony before the Commission "that her calculation was not an interpretation of the words of the Plan." Trial Court Opinion, dated 12/2/11, at 40. Further, the court observed that her testimony, as well as that of the Mockenhaupt actuary who had performed the relevant Act 205 cost studies, revealed that Ms. Taylor had "merely assumed that there was a 15% limit on the COLA for [e]arly [r]etirees, an assumption that is nowhere to be found within the four corners of the CBA or the Plan." *Id.* Going further, the court determined that "Ms. Taylor *ignored* the clear and unambiguous language of the Plan that *all* retirees were 'participants,' entitled to COLA increases until their pension payment reached 90% of [their final average monthly compensation]." *Id.* at 41 (emphases in original). To the extent that Ms. Taylor's testimony constituted parol evidence concerning an interpretation of a contractual term, the court opined that such testimony was not relevant or appropriate when the relevant language of the Plan is plain and unambiguous.[6]

For the above reasons, the trial court concluded that (1) Act 205 did not require the adoption of a 15% cap on COLA increases for early retirees; (2) Act 205 did not prohibit the implementation of the Plan as written; and (3) Pennsylvania law does not permit municipalities to benefit from their own mistakes to the detriment of innocent pensioners. Accordingly, the trial court ordered the Municipality and its Plan Administrator to calculate and pay COLAs in accordance with the plain language of the Plan, which allows all participants to

6. The trial court also determined that the evidence appeared to show that the number of early retirees affected by the decision is limited, perhaps to only the two individual appellants herein, Palombine and Gehrmann. Trial Court Opinion, dated 7/28/11, at 9.

receive COLA increases until the participant receives 90% of her or his final average monthly compensation.

The Municipality appealed, and the Commonwealth Court reversed. *United Police Society of Mt. Lebanon v. Mt. Lebanon Commission*, 49 A.3d 4 (Pa.Cmwlth.2012). The Commonwealth Court disagreed with the trial court regarding the question of whether Act 205 had been violated and, in so doing, emphasized the primacy of Act 205 over pension plans, in particular, the requirement that before there can be any modification to a pension plan there must be a "complete and accurate" cost study performed. *Id.* at 10, quoting 53 P.S. § 895.305(e). Further, the Commonwealth Court appeared to disagree with the trial court's determination that the Plan language regarding COLA caps was plain and unambiguous, and apparently agreed with the Commission that the relevant language was subject to interpretation. The court concluded that because the Union's interpretation of the Plan had not been subject to a cost study under Act 205, the Plan could not be implemented pursuant to Act 205. *Id.* at 13. However, because the Municipality's interpretation of the COLA cap provision had been scrutinized under an Act 205 cost study, the court determined that this interpretation must prevail, as "the statute [Act 205] must be given effect." *Id.,* quoting *Ellwood City v. Police Department*, 825 A.2d at 622.

The Commonwealth Court additionally summarized its analysis as follows:

There is no dispute that the cost estimate was performed with these assumptions [i.e., the information provided by the Municipality to the actuary] and at a time when the plan language was not yet in existence. There also is no evidence in the record that the Officers bargained for their particular interpretation of the COLA prior to the adoption of the plan language, although that language can be reasonably interpreted in the manner that they now propose. There is no evidence that any bad faith was involved by the parties or that the Municipality promised to provide the COLA pursuant to the interpretation that Union and Officers are now advocating. In short, there is no evidence in

the record that, prior to the adoption of the language in the Ordinance, the Municipality specifically promised to calculate the COLA for early retirees differently than they would for normal retirees. This is, therefore, not a case of fundamental unfairness where a retroactive advantage is attempted to be gained when a fundamental term of an agreement is later found to be altered by an existing statute. *See Ellwood City [v. Police Department]*, 573 Pa. at 369, 825 A.2d at 626–27 (Castille, J., concurring and dissenting). *Id.*[7]

We granted the separate appeals of the Union and retired-Officers Palombine and Gehrmann, agreeing to review the following issues:

a. Whether a municipality that collectively bargains to provide a particular pension benefit improvement, and confirms its bargain by legislatively adopting the benefit in its Pension Ordinance (and numerous subsequent amendments), may subsequently refuse to provide the benefit because one of its managers directed the Plan Actuary to perform an Act 205 cost estimate on the effect of adding a different and lesser benefit.

b. Did the Commonwealth Court err in reversing the trial court's conclusion that the Respondent municipality acting through Marcia Taylor disregarded the clear language of Section 4.09 of the pension plan by terminating Officers Gehrmann's and Palombine's two percent (2%) cost of living payments before they had equaled ninety percent (90%) of their final average monthly compensation?

c. Did the Commonwealth Court err in reversing the trial court's conclusion that the Respondent municipality used its own failure to comply with Act 205 as a defense to its refusal to properly calculate the COLA benefits to

7. The Commonwealth Court also cited evidence from the record that if early retirees were given the same COLA cap as regular retirees (that is, a COLA cap of 90% of the retiree's final average monthly compensation), it would cost the Plan more than it does as currently implemented. However, the court does not cite to any evidence that such extra costs would cause an underfunding of the Plan.

which Officers Gehrmann[ ] and Palombine[ ] are entitled under the police officers pension plan?

Additionally, we requested that the parties address the possible range of remedies available under Act 205 and our case law interpreting that Act, in light of the factual scenario in this case. *United Police Society of Mt. Lebanon v. Mt. Lebanon Commission*, 621 Pa. 128, 74 A.3d 1025 (2013).

Before us, the Union first takes issue with the Commonwealth Court's determination that there was no evidence that the parties had bargained for the language in the Plan that applies the same COLA cap to all participants, namely, a COLA cap of 90% of a participant's final average monthly compensation. The Union notes that the 90% cap, which applies to all participants, is the only cap mentioned in the Plan, indicating a bargained-for result. Further, the Union observes that the Municipality's own witnesses testified that the language of the Plan governed its implementation, and that the Plan makes no mention of a 15% cap, but only of a COLA cap of 90% of a participant's final average monthly compensation. Additionally, the Union cites to the 2004 amendment, that carved out an exception for COLA increases for early retirees, and the testimony underlying the adoption of that amendment as evidencing the "mutual understanding" of the Municipality and the Union "that the ninety percent ... cap applied to early retirees." Union's Brief at 18.

Notably, the testimony regarding the 2004 amendment addressed the Municipality's concern that it was unfair for early retirees with between seven and twenty years of service to receive a COLA cap equal to that of retirees with more than twenty years of service. Corporal Duane Fisher, who had negotiated for the Union for the 2004–06 CBA, testified before the Commission that the Union had agreed with the Municipality on this point, and that the parties had rectified the issue by slowing the rate of COLA increases for this group of early retirees, from 2% of the participant's final average monthly compensation to 2% of the participant's pension benefit. The COLA cap, however, was not changed during these negotiations; indeed, Corporal Fisher testified that the only issue

regarding early retirees was how quickly regular and early retirees would, respectively, obtain the 90% cap. Notes of Testimony ("N.T."), 9/27/10, at 14–18. Further, during the negotiations, the Municipality successfully fended off the Union's attempt to remove the cap altogether for all participants. *Id.* at 17. The parties further agreed in the 2004 CBA that pensions, including COLAs, for officers hired on or after January 11, 2004, would—and must—be governed by the provisions of the law known as Act 600, 53 P.S. §§ 767–778, and not by the provisions at issue in this case.[8] All of these amendments, including the 90% cap negotiated into the CBA, became part of the Plan adopted by the Municipality via its own ordinance.

The Union thus contends that this history establishes that the parties understood that the COLA cap set forth in Section 4.09 of the Plan applied to all participants, as its language indicates, including early retirees. Otherwise, had the Municipality wished to restrict COLA raises even further—in the manner purportedly understood by the Assistant Manager of the Municipality—then the Municipality would have had to negotiate along those lines as well as the lines it had negotiated to restrict COLA increases for certain early retirees hired before January 11, 2004, and those hired afterward. The Union contends that had "early retirees" been subject to a cap of "fifteen percent . . . in total cost of living increases, as the Municipality asserts, then it never would have been necessary to adjust the annual COLA depending on years of service," as had happened. Union's Brief at 20.

The Union also emphasizes that, under settled law, the plain language of the CBA and Plan control: that is, all participants have the benefit of the 90% COLA cap, including early retirees. No other language in the CBA or Plan indicates or suggests otherwise. The Union follows by citing to a number of decisions by this Court that have held that a municipality

8. Section 5(g) of Act 600, Act of May 29, 1956, P.L. (1955) 1804, *as amended*, governs cost of living increases for all retirees and differs from the benefits provided for participants set forth Section 4.09 of the Plan. 53 P.S. § 771(g).

must abide by the clear terms of its bargained-for agreements and may not escape its obligations under a CBA by declaring a term "illegal." *See Fraternal Order of Police v. Hickey,* 499 Pa. 194, 452 A.2d 1005, 1008 (1982); *Grottenthaler v. Pennsylvania State Police,* 488 Pa. 19, 410 A.2d 806, 809 (1980); and *Pittsburgh Joint Collective Bargaining Committee v. City of Pittsburgh,* 481 Pa. 66, 391 A.2d 1318, 1322–23 (1978).

The Union then addresses the impact of Act 205 upon this case. In so doing, the Union tracks the analysis of the trial court. First, the Union characterizes this case as one of estoppel; that is, basic contract law would prohibit a municipality from evading a contractual obligation because its own action or inaction may have prevented a condition precedent to fulfill the obligation.[9] The Union then notes that Act 205 places upon the municipality the responsibility for obtaining complete and accurate cost estimates for any changes to a pension plan. *See* Union's Brief, citing 53 P.S. § 895.305. The Union thus argues that equity requires the Municipality to live up to its contractual obligation: a COLA cap of 90% of the final average monthly wage for all participants, including early retirees (aside, of course, from those officers hired after January 11, 2004, whose pensions are governed by Act 600). The Union cites the hypothetical example of an officer retiring at age 50 under the terms of a pension plan, but then required either to return to service or forfeit her or his pension because the municipality had provided the wrong information to the actuary doing the Act 205 cost study and, as a result, the officer's early retirement had not been considered in the study.

The Union then sets forth an argument distinguishing the instant case from *Ellwood City v. Police Department, supra.* The Union notes that that case involved a dispute between the police union and the municipality over the funding of the police pension plan and the union's efforts to escape the

9. The Union cites cases articulating basic principles of estoppel. *See Novelty Knitting Mills, Inc. v. Siskind,* 500 Pa. 432, 457 A.2d 502 (1983); *Borough of Nanty–Glo v. American Surety Co. of New York,* 316 Pa. 408, 175 A. 536 (1934).

funding mandates of Act 205. In the ensuing arbitration, the union won an award that defined actuarial soundness in a manner that differed from the definition provided by Act 205. This Court ruled that the requirements of Act 205 prevailed over any competing arbitration award, as the legislature intended. *Ellwood City v. Police Department*, 825 A.2d at 623–24. Here, the Union contends that the present matter has no similarity to the issue before this Court in *Ellwood City v. Police Department*. That is, the instant case does not concern an arbitration award that violates or ignores provisions of Act 205; rather, it concerns whether a bargained-for term in a CBA and pension plan may be avoided (and a non-bargained-for term substituted in its place) simply because the municipality provided incorrect information to the Act 205 actuary.[10] In this respect, the Union asserts that the case is more similar to *Hickey, supra; Grottenthaler, supra;* and *Pittsburgh Joint Collective, supra;* which the Union notes that this Court in *Ellwood City v. Police Department* discussed but did not overrule based on Act 205. Additionally, the Union notes that the cost study requirement of Act 205 is meant to make sure that pension plans are not underfunded or do not become insolvent, and, in this case, there was no evidence that if the Municipality had honored the Plan provisions regarding COLA caps for certain early retirees, it would result in any manner of fiscal jeopardy to the Plan.[11]

10. The Union argues: "The cost estimate provisions of Act 205 were not created as a tool by which municipalities can pry from its employees[ ] the pension benefits that it [had] agreed to provide to them during negotiations and confirmed in a pension ordinance." Union's Brief at 29.

11. Appellants Palombine and Gehrmann also view this case as one of estoppel. They likewise dispute the conclusion of the Commission and the Commonwealth Court that the Municipality did not act in bad faith, contending that by ignoring the plain language of the Plan concerning COLA caps, the Municipality most certainly had acted in bad faith, triggering the remedy of estoppel. These Appellants also note that had the Municipality followed the Plan language, Officer Gehrmann would reach his COLA cap in 2023 and Officer Palombine would have reached his cap in 2007; however, the Municipality had ended Officer Gehrmann's COLA increases in 2009, and had ended Officer Palombine's COLA increases in 2006.

The Municipality argues that the Commission and Commonwealth Court both correctly determined that Act 205 controls this case, specifically, the Act's mandatory requirement that any plan amendment be preceded by a cost estimate. The Municipality contends that the Commonwealth Court's opinion must be upheld because it correctly adhered to Act 205's mandate. In this regard, the Municipality further contends that Act 205 does not provide for an estoppel-based or mistake-based exception, and that the Union's reliance on *Hickey, Grottenthaler,* and *Pittsburgh Joint Collective* is misplaced because those cases do not address Act 205, much less its mandatory cost estimate requirement.

The Municipality also squarely views Section 4.09 of the Plan, addressing the COLA cap, as fully subject to interpretation where early retirees are concerned. The Municipality cites Section 803 of the Plans of both 2000 and 2004, which delineates the authority and duties of the plan administrator. The Municipality quotes the following passage from this Section:

> The Plan Administrator shall have full power and authority to do whatever shall, in its judgment, be reasonably necessary for the proper administration and operation of the Plan. The interpretation or construction placed upon any term or provision of the Plan by the Plan Administrator taken in good faith shall, upon the Commission's review and approval thereof, be final and conclusive upon all parties hereto, whether Employees, Participants or other persons concerned.

Plan, Section 8.03, at 21 (2004 Plan); at 16 (2000 Plan).

The Municipality argues that as the Plan Administrator and Municipality were found by the Commission to have acted in good faith when they had provided their interpretation of the COLA cap for early retirees to the Act 205 actuary, substantial evidence supports the Commission's determination on this fact, and Appellants herein are simply impermissibly attempting to re-litigate the case.

The Municipality also contends that the retroactive remedy sought by Appellants not only lacks authority and precedent in Act 205 and the case law interpreting it, but is contrary to the purposes of Act 205 itself. The Municipality asserts that the Act 205 cost study required before implementation of any amendment to a pension plan is not a *pro forma* matter that may be ignored when equities suggest another result, but rather is one that cuts to the heart of the purpose of Act 205, which is to make sure that decision-makers are informed on how the amendment will impact plan solvency. To that end, at oral argument, all parties, including the Municipality, agreed that this Court has the authority to order the Municipality to conduct a new Act 205 cost study, should this Court determine that the COLA cap for early retirees is such as advocated by Appellants.

■ Because a complete record was made before the Commission, our standard of review here is that followed by the appellate tribunals below; we must affirm the Commission unless we determine that its adjudication violates constitutional rights, is not in accordance with law, violates statutorily mandated matters of practice and procedure before local agencies, or if any finding of fact made by the Commission and necessary to support its adjudication is not supported by substantial evidence. If we do not affirm the adjudication, we may enter any order authorized by 42 Pa.C.S. § 706 (relating to disposition of appeals). 2 Pa.C.S. § 754(b).

We begin by reviewing the relevant Plan provisions. Section 4.09 of the 2000 Plan provides:

*Cost of Living Adjustment*—Each Participant who shall retire hereunder and commence payment of a retirement benefit shall be eligible to receive a cost of living adjustment to such retirement benefit in an amount equal to two percent (2%) of the Participant's Final Average Monthly Compensation annually. The cost of living adjustment shall be applied as of the beginning of each Plan Year during which a Participant shall be eligible for such adjustment and shall thereafter be paid monthly in addition to the retirement benefit paid under the Plan. Such a cost of living

adjustment shall only be made on behalf of each Participant until such time as the total monthly benefit paid to the Participant[,] including the retirement benefit, any Service Increment, any military service benefit, and all cost of living adjustments, shall be an amount equal to ninety percent (90%) of the Participant's Final Average Monthly Compensation.

Plan, Section 4.09, at 9 (2000 Plan).

Section 4.09 of the 2004 Plan provides:

*Cost of Living Adjustment*—Each Participant who shall have completed at least twenty (20) years of Credited Service with the Employer and who shall retire hereunder and commence payment of a retirement benefit shall be eligible to receive a cost of living adjustment to such retirement benefit in an amount equal to two percent (2%) of the Participant's Final Average Monthly Compensation annually. Each Participant who shall have completed less than twenty (20) years of Credited Service with the Employer and who shall retire hereunder and commence payment of a retirement benefit shall be eligible to receive a cost of living adjustment to such retirement benefit in an amount equal to two percent (2%) of the Participant's retirement benefit. The cost of living adjustment shall be applied as of the beginning of each Plan Year during which a Participant shall be eligible for such adjustment and shall thereafter be paid monthly in addition to the retirement benefit paid under the Plan. Such a cost of living adjustment shall only be made on behalf of each Participant until such time as the total monthly benefit paid to the Participant[,] including the retirement benefit, any Service Increment, any military service benefit, and all cost of living adjustments, shall be an amount equal to ninety percent (90%) of the Participant's Final Average Monthly Compensation.

Plan, Section 4.09, at 11 (2004 Plan).

Additionally, the 2004 Plan contains a COLA provision for Participants hired on or after January 11, 2004, which states in relevant part:

*Cost of Living Adjustment*—Each Participant first hired on or after January 11, 2004[,] who shall retire and receive a benefit determined pursuant to sections 4.02A, 4.04A or 6.02A, hereunder[,] shall be entitled to receive a cost of living adjustment to the amount of benefit payable to such Participant effective as of the first day of each Plan Year following the date which is twelve (12) months after the date the benefit payments commenced.... No cost of living adjustment shall ever exceed any of the following limits: (1) the percentage increase in the Consumer Price Index for Urban Wage Earners and Clerical Workers (CPI–W) from the year in which the Participant was last employed as an Employee of the Employer; (2) the total retirement benefits payable under this Plan shall not exceed seventy-five percent (75%) of the Participant's Final Average Monthly Compensation annually[;] (3) the total cost of living adjustment shall not exceed thirty percent (30%) of the Participant's retirement benefit under this Plan; and (4) the cost of living adjustment shall not impair the actuarial soundness of the Pension Fund.

Plan, Section 4.09, at 36 (2004 Plan).

Both the 2004 and 2000 Plans define "Participant" as "any Employee who has commenced participation in this Plan in accordance with Article II, and has not for any reason ceased to participate hereunder." Plan, Section 1.32, at 6 (2004 Plan); Section 1.30, at 5 (2000 Plan). In turn, "Employee" is relevantly defined in both Plans as "any individual employed by the Employer and classified as a regular full-time police officer." Plan, Section 1.20, at 4 (2004 Plan); Section 1.19, at 4 (2000 Plan). Article II of both Plans briefly discusses eligibility requirements for participation in the Plan without differentiating between regular and early retirees. Plan, Sections 2.01–2.06, at 7–8 (2004 Plan); at 6–7 (2000 Plan).

■ The above language of both Plans makes clear that there was no basis in the CBA or the Plans to conclude that the COLA cap for early retirees was any different from what the plain language of those documents delineated: that the COLA cap for all Participants, including early retirees, is "an

amount equal to ninety percent (90%) of the Participant's Final Average Monthly Compensation." Plan, Section 4.09, at 11 (2004 Plan), at 9 (2000 Plan). Thus, the issue of the COLA cap here did not concern an "interpretation;" rather, it required only a simple plain reading of the words of the Plan. Thus, we hold that both the Commission and Commonwealth Court erred to the extent that their decisions rested upon their view that the COLA cap for early retirees was subject to interpretation.[12] Additionally, because the language of Section 4.09 of the Plan is plain with respect to the COLA cap, we reject the Municipality's argument that it was entitled to rely upon language from Section 8.03 of the Plan, namely, that "[t]he interpretation or construction placed upon any term or provision of the Plan by the Plan Administrator taken in good faith shall, upon the Commission's review and approval thereof, be final and conclusive upon all parties. . . ." *Id.* at 21 (2004 Plan); at 16 (2000 Plan). Rather, the Municipality's rejection of the Plan's plain language that bestowed a benefit runs afoul of the Plan's prohibition against the Plan Administrator subtracting from or modifying the terms of the Plan. Section 8.03 of the Plan, which contains this prohibition, provides as follows:

> The Plan Administrator shall have no power to add to, subtract from[,] or modify the terms of the Plan or change or add to any benefits provided by the Plan, or to waive or fail to apply any requirements of eligibility for benefits under the Plan. Further, the Plan Administrator shall have no power to adopt, amend, or terminate the Plan. . . .

*Id.* at 21 (2004 Plan); at 17 (2000 Plan).

Further, as we stated in regard to a case in which we determined that a municipality was subsequently precluded

12. Further, we disagree with the assessment of the Commission that Appellants are seeking unequal treatment for early retirees with respect to the COLA cap. Viewed through the plain language of the Plan, Appellants are seeking the equal treatment that the Plan bestows upon those Participants who are regular retirees and those who are early retirees: a cap of 90% of the Participant's final average monthly compensation.

from arguing the illegality of a term that it had bargained for with the public union:

> To permit an employer to enter into agreements and include terms ... which raise the expectations of those concerned, and then to subsequently refuse to abide by those provisions on the basis of its lack of capacity would invite discord and distrust and create an atmosphere wherein a harmonious relationship would virtually be impossible to maintain.

*Pittsburgh Joint Collective,* 391 A.2d at 1322.

However, we must nevertheless consider how Act 205 affects the proper disposition of this case. Because the Municipality provided the wrong information to the actuary performing the Act 205 cost study with respect to the COLA cap for early retirees, the Municipality failed to obtain a "complete and accurate" actuarial cost estimate, as required by Act 205. 53 P.S. § 895.305(e) ("Any cost estimate of the effect of the proposed benefit plan modification shall be complete and accurate and shall be presented in a way reasonably calculated to disclose to the average person comprising the membership of the governing body of the municipality, the impact of the proposed benefit plan, the modification on the future financial requirements of the pension plan and the future minimum obligation of the municipality with respect to the pension plan."). Thus, as here, the implementation of a pension plan based on an incomplete and inaccurate cost estimate is a violation of Act 205 in itself. For this reason, the Commission erred by ordering the Plan's implementation along the lines of the incomplete and inaccurate Act 205 cost study, which was, in turn, based on the incomplete and inaccurate information supplied by the Municipality.

█ Notwithstanding the above, the Commission's error does not necessitate that we now order the remedy previously ordered by the trial court and now sought by Appellants. We must first consider the relevant requirements of Act 205, which, as we have noted, have primacy over, *inter alia,* any pension agreement to the contrary. *Ellwood City v. Police Department, supra* at 622–23. Thus, we turn to Act 205 and

*Ellwood City v. Police Department* to consider how this case should next proceed.

■ Fundamentally, Chapter 3 of Act 205, which the legislature makes paramount over any competing municipal law or pension agreement, is concerned with ensuring that municipality pension plans are adequately funded by the municipality. Thus, the central provisions of this chapter set minimum funding standards for such plans (53 P.S. §§ 895.302 and 895.303), and, as the trial court here observed, provide for the remedy of mandamus when the municipality fails to comply with the funding standards established by Act 205. 53 P.S. § 895.306. Persons having standing to bring a mandamus action include any person beneficially interested in the affairs of the pension plan, including active or retired members of the plan, and the Public Employee Retirement Study Commission ("PERSC"). 53 P.S. § 895.306(c)-(d).

Within its scheme, as thus explained, Chapter 3 of Act 205 provides that before there can be any amendment to a municipal pension plan that is subject to and has been certified as meeting the funding standards of the Act, a cost estimate must be made of the effect of the proposed modification. 53 P.S. § 895.305(a). Such cost estimate "shall be complete and accurate" so that the municipality will be able to plainly discern "the impact of the proposed benefit plan, the modification on the future financial requirements of the pension plan[,] and the future minimum obligation of the municipality with respect to the pension plan." 53 P.S. § 895.305(e).[13]

Notably, Act 205 does not provide for a remedy should such cost estimate not be made, although a plan modification that triggers the need for a cost estimate and which jeopardizes the municipality's meeting the funding standards established by Chapter 3 would plainly be a circumstance that the Act addresses. However, Act 205 does not provide for the remedy that a cost estimate based on incorrect information regarding

13. Subsections (b)-(c) of Section 305 simply describe who shall make the cost estimate and in what manner it shall be made, depending upon the type of municipal plan, e.g., defined benefit or defined contribution plan. 53 P.S. § 895.305(b)-(c).

the proposed amendment must or should thereafter unilaterally modify the pension plan and govern its implementation. Such a result is insupportable.

Chapter 3 of Act 205 also provides, however, that its provisions apply notwithstanding contrary provisions of law or agreement. 53 P.S. § 895.301(a). In *Ellwood City v. Police Department*, we determined that "in the event of an actual conflict between the statute and a collective bargaining agreement, the statute must be given effect." *Id.* at 622. Although this case does not involve what could be described as an actual conflict between the CBA, the 2000 Plan, and the 2004 Plan and Act 205, the modifications of Section 4.09 of the Plan, as concerning COLA caps for certain early retirees, lack a complete and accurate cost study as required by Section 305. Accordingly, and because of the legislative directive as to the primacy of Chapter 3 over any other local law or agreement, we may not reinstate the remedy of the trial court, i.e., the automatic implementation of the Plans as written, absent a complete and accurate cost study.

The only appropriate remedy available is to remand the matter for an order directing the Municipality to comply with its mandate under Section 305: to make a complete and accurate cost study that includes the correct COLA cap for certain early retirees, as herein determined. "An appellate court may affirm, modify, vacate, set aside or reverse any order brought before it for review, and may remand the matter and direct the entry of such appropriate order, or require such further proceedings to be had as may be just under the circumstances." 42 Pa.C.S. § 706.

Indeed, Chapter 3 of Act 205 vests the PERSC, an administrative body, with broad and significant power to order a municipality to comply with Act 205, including, it would appear, the power to order the municipality to obtain a Section 305 cost study that is complete and accurate. We note that Section 307(a) of Act 205 provides as follows:

(a) **Enforcement by commission.**—Whenever the commission is of the opinion that any municipality has failed,

omitted, neglected or refused to perform any duty enjoined upon it pursuant to this act, the commission shall have the power and its duty shall be to order compliance by the municipality with that duty. If the municipality fails, omits, neglects or refuses to comply with any lawful order of the commission, then the commission may institute legal proceedings for injunction, mandamus or other appropriate remedy at law or equity to enforce compliance with, or restrain violation of, the order of the commission.

53 P.S. § 895.307(a).

Under the peculiar facts of this case, this Court has no less constraint. Accordingly, we hold that it was error to impose a unilateral change to the Plan at odds with its plain language based on the results of an incomplete and inaccurate Act 205 cost study. We therefore reverse the order of the Commonwealth Court and remand this case to that court for further remand to effectuate a complete and accurate Section 305 cost study.[14] Jurisdiction relinquished.

Former Justice McCAFFERY did not participate in the decision of this case.

Justices SAYLOR, BAER, TODD and STEVENS join the opinion.

Chief Justice CASTILLE files a dissenting opinion in which Justice EAKIN joins.

Chief Justice CASTILLE, dissenting.

Because I believe the Per Curiam Opinion turns the Municipal Pension Plan Funding Standard and Recovery Act ("Act

**14.** It may well be, as the trial court determined, that a cost study that includes the correct COLA cap for certain early retirees will reveal no jeopardy to the fiscal soundness of the Plan whatsoever. It is further unclear why the Municipality did not simply seek an amended cost study to determine the effect of the COLA cap for early retirees as written and advocated by Appellants, in an effort to effect a satisfactory resolution of the instant controversy, particularly when Act 205 also requires municipalities to biennially file actuarial valuation reports. *See* 53 P.S. § 895.201.

205")[1] on its head, I respectfully dissent.

From the outset, I note that our standard of review is indispensable in ascertaining the facts of this case, as to which we construe and apply Act 205, since there seems to be some tension between the findings of the Mt. Lebanon Commission below and the factual recitations and characterizations of the Court of Common Pleas below, and the Per Curiam Opinion by this Court. In the context of judicial review of the actions of a local agency such as the Mt. Lebanon Commission, the mandatory administrative law and procedure is clear. Section 754 in Title 2 of the Pennsylvania Consolidated Statutes provides:

> **(b) Complete record.**—In the event a full and complete record of the proceedings before the local agency was made, the court shall hear the appeal without a jury on the record certified by the agency. After hearing the court shall affirm the adjudication unless it shall find that the adjudication is in violation of the constitutional rights of the appellant, or is not in accordance with law, or that the provisions of Subchapter B of Chapter 5 (relating to practice and procedure of local agencies) have been violated in the proceedings before the agency, or that any finding of fact made by the agency and necessary to support its adjudication is not supported by substantial evidence. If the adjudication is not affirmed, the court may enter any order authorized by 42 Pa.C.S. § 706 (relating to disposition of appeals).

2 Pa.C.S. § 754. This Court has confirmed that where, as here, the Court of Common Pleas in reviewing local agency action takes no additional evidence, such that a full and complete record is made before the local agency, our standard of review is limited, under section 754(b), to determining whether the local agency violated a constitutional right or committed an error of law, or whether **the local agency's** factual findings are unsupported by substantial evidence. *V.L. Rendina, Inc. v. City of Harrisburg,* 595 Pa. 407, 938 A.2d 988 (2007). Thus, the finder of fact in these circumstances is the local agency alone, and there is no place for

1. 53 P.S. §§ 895.101–895.803.

additional fact finding by the courts at any level. Whether the record might support additional or contrary factual findings is of no moment.

As respecting factual inquiry, the relevant question for the courts is simple and modest: whether the local agency's factual findings have any substantial evidentiary support in the record. If so, then the local agency's factual findings control, and it is not within the province of the judiciary to make a contrary factual assessment. *Accord In re Thompson,* 896 A.2d 659, 668 (Pa.Cmwlth.2006) ("A reviewing court may look only to the evidence relied upon by the fact finder . . . to see if it is sufficiently substantial to support the findings. . . . The reviewing court is not to substitute its judgment on the merits for that of the municipal body. . . . [T]he court is bound by the municipal body's findings which are the result of resolutions of credibility and conflicting testimony.") (citing 2 Pa.C.S. § 754(b)). Here, the Mt. Lebanon Commission is unquestionably the sole fact-finder. Its findings are binding, except to the extent that they are determined to be unsupported by the record.

That stated, the following are several of the Commission's findings which are relevant to the analysis at this juncture:

2. The [Mt. Lebanon, Pennsylvania Police Officers' Pension Plan ("Plan")] provides a Normal Retirement Benefit, payable . . . when a participant reaches age 50 and has completed 25 years of service.

. . . .

4. . . . A normal retiree can . . . receive a maximum of 15% in [cost of living adjustment ("COLA")] benefits.

5. The Plan allows for early retirement after seven years of service.

. . . .

8. . . . . [T]he only cost study that was carried out in this case assumed that the COLA was limited to 15%. . . .

. . . .

10 The first time the [United Police Society of Mt. Lebanon ("UPS" or "Union")] requested a cost-of-living

adjustment [for retirees] was in 1999 during contract negotiations that resulted in a collective bargaining agreement being entered into in 2000. . . .

11. Marcia Taylor is the Assistant Manager of the Municipality, and is charged with administration of the Plan. Ms. Taylor was present and participated in the 1999 Negotiations.

12. **The COLA provision of the Plan was agreed to in the 1999 Negotiations.**

13. The parties to the 1999 Negotiations did not specifically discuss how the COLA provision would apply to the Early Retirement Benefit. Consequently, the 2000 Plan contains no language describing how, if at all, the COLA provision should be applied to retirees who elect the Early Retirement Benefit option.

. . . .

22. After **the parties reached [a] tentative agreement** concerning the issues discussed during the 1999 Negotiations **but prior to ratification of the tentative agreement by the Commission, Ms. Taylor** . . . **requested that [Mockenhaupt Benefits Group, an actuarial consulting firm] calculate the cost of the new retirement plan provisions.** Ms. Taylor's request did not include a specific request that Mockenhaupt consider the cost, if any, of the COLA provision's impact as it relates to the Plan's Early Retirement Option.

23. **Mockenhaupt performed a cost study, but only in terms of the effect on the Normal Retirement Benefit. Early retirement was not included.**

24. Thus, the interpretation of the COLA currently proposed by the UPS was not included in this study.

25. . . . . [W]ith respect to [a] 2004 Amendment . . . a cost study was done by Mockenhaupt that reflected the COLA as it was being administered; i.e., with a 15% cap for early retirees.

26. **Ms. Taylor's actions in requesting the cost studies and in administering the Plan were based on a good**

**faith belief that this is how the COLA should be implemented.**

Findings and Conclusion of Commission at 1–6 (emphases added). Notably, the Per Curiam Opinion does not establish that any of these factual findings are unsupported by substantial evidence.[2] Therefore, the Court's analysis should begin with an acknowledgment that these findings of fact are binding in this Court, notwithstanding any improper judicial fact-finding or characterization to the contrary that has arisen since the matter made its way into the courts.

Applying Act 205 to the actual facts that constrain our role in review, it is readily apparent that the Plan at issue is unlawful as construed by the Union. Section 301 of the Act provides, in relevant part:

**2.** The Per Curiam Opinion does recite a trial court conclusion that there was not substantial evidence to support the Commission's finding that Ms. Taylor interpreted the Plan in good faith, since—in the opinion of the trial judge—her calculation was not an interpretation of the Plan, but an assumption on her part by which she ignored the clear language of "the Plan," and since—again in the opinion of the trial judge—her testimony on this point was neither relevant nor appropriate since the language of the Plan is unambiguous. This conclusion by the trial court erroneously disregards and mischaracterizes the findings of the Commission. In the first place, the Commission did not find that the information Ms. Taylor submitted to the actuary was based on a good faith "interpretation" of "the Plan." What the Commission actually found was that her actions in requesting the initial cost study and in administering the Plan were based on her good faith belief, not an interpretation of "the Plan." And while the trial court held out the finalized and adopted Plan as the end-all with respect to Ms. Taylor's actions in securing the initial cost study, such that none of her testimony is relevant concerning whether her actions were taken in good faith, the Per Curiam Opinion's summary of the trial court's conclusion neglects to acknowledge that at the time of her actions in requesting the initial cost study, there was no finalized and adopted Plan, but merely a proposed plan based on negotiations in which Ms. Taylor participated, for submission to the Commission for an approval decision informed by the requisite cost study she was requesting. In other words, when Ms. Taylor submitted information to the actuary to secure the requisite cost study, there was no controlling Plan or Plan language, because the Plan had yet to be adopted, and was necessarily, therefore, subject to change. *See* 53 P.S. § 895.305(a) and (e). The windfall approved by the Court today derives from this initial judicial error, deriving from a misapprehension of the limits of judicial review here.

Notwithstanding any ... municipal ordinance ... pension plan agreement or pension plan contract to the contrary, the applicable provisions of this chapter shall apply to any municipality which has established and maintains, directly or indirectly, a pension plan for the benefit of its employees ... and to the respective pension plan.

53 P.S. § 895.301. Further, Section 305 of the Act, which is entitled "Actuarial cost estimate required for benefit plan modification," dictates in clear mandatory terms:

(a) ... **Prior to the adoption of any benefit plan modification** by the governing body of the municipality, the chief administrative officer of each pension plan shall provide to the governing body of the municipality a cost estimate of the effect of the **proposed** benefit plan modification.

. . . .

(e) ... **Any cost estimate of the effect of the proposed benefit plan modification shall be complete and accurate** and shall be presented in a way reasonably **calculated to disclose** to the average person comprising the membership of the governing body of the municipality, **the impact of the proposed benefit plan,** the modification on the **future financial requirements** of the pension plan **and the future minimum obligation of the municipality** with respect to the pension plan.

53 P.S. § 895.305 (emphasis added). Thus, concerning benefit plan modification—which is what is actually at issue here—as noted in *Borough of Ellwood City v. Ellwood City Police Department Wage & Policy Unit,* 573 Pa. 353, 825 A.2d 617, 623 n. 11 (2003), Act 205 "mandates that such change be preceded by a cost estimate [accurately] describing the impact upon the plan." There, the Court further noted that 53 P.S. § 895.306(a) declares the legislative finding that failure to adhere to Act 205's requirements "threatens serious injury to the affected municipal pension plan, to the entire system of public employee pension plans in the Commonwealth and to the Commonwealth itself." In light of this unambiguous legislative declaration, Act 205 prohibits "the making of a contrary agreement" and requires that in the event of a

conflict between Act 205's requirements and a collective bar-gaining agreement, the statute must be given effect, even at the expense of the contrary agreement. *Borough of Ellwood City,* 825 A.2d at 622. Thus, notwithstanding this Court's continuing recognition of the sanctity of the collective bargain-ing process, this Court is also obliged to give due respect to the legislative decision to subordinate this policy to the stan-dards and requirements set forth in Act 205, including the prerequisite of a complete and accurate cost study. *See id.* at 623. Furthermore, *Borough of Ellwood City* made it clear that even "where a political subdivision secures material ad-vantage by way of promises that the Legislature has rendered incapable of enforcement, judicial and quasi-judicial tribunals lack authority to require fulfillment of such promises in the first instance." *Id.* at 624.

What this Court, therefore, cannot do, and what the lower tribunals could not do, is set aside Act 205's cost study prerequisite in order to salvage a benefit plan modification which is unsupported by a complete and accurate cost study. And while the Per Curiam Opinion posits that the appropriate remedy here is to remand the matter to secure a complete and accurate cost study in support of the Union's proffered view of the Plan, doing so would not satisfy the requirements of Act 205, unless the Plan itself is invalidated. This is so because Act 205 requires a complete and accurate cost study to be secured "**Prior** to the adoption of any benefit plan modifica-tion[,]" so as to inform the governing body, **prior to such adoption,** as to "the impact of the proposed . . . modification on the future financial requirements of the pension plan and the future minimum obligation of the municipality." 53 P.S. § 895.305 (emphasis added). Anything less than that fails to satisfy Act 205. The courts are not authorized to manipulate the facts to ensure a windfall contrary to the legislative command. Requiring the Municipality to abide by a plan modification illegally adopted without being informed by a complete and accurate cost study, which the Per Curiam Opinion apparently does in the name of enforcing Act 205, simply does not satisfy Act 205's requirement of a "prior" cost

study. Rather, that approach turns the Act on its head by mandating compliance with a plan modification made without the benefit of an accurate cost study, and based on the completion of a **subsequent** cost study which did not inform the decision to adopt the plan modification at issue.

To be clear, the Union's proffered understanding of the plan modification at issue, which the Per Curiam Opinion concludes is the only plausible reading of the Plan as modified, requires an uncapped increase in benefits for early retirees, by way of an annual COLA, until the early retiree reaches an annual benefit of 90% of his final average monthly compensation. That is a very sweet deal. The Municipality not only disagrees with this reading, but never secured a cost study to support it. Therefore, if the 2000 plan modification is as understood by the Union and as insisted upon by the Per Curiam Opinion here, then the plan modification was illegally adopted in 2000 in violation of Act 205, and must be invalidated in order to give effect to Act 205's controlling requirements. Such an invalidation would certainly come with significant consequences.

I remain of the view that, "where a party to a CBA invokes a pre-existing statute to avoid the consequences of a provision included in the CBA, and where the issue involves a core employment term such as ... pensions ... then the CBA should be rescinded and the bargaining *status quo ante* restored." *Borough of Ellwood City*, 825 A.2d at 626 (Castille, J., concurring and dissenting). Here, however, the Municipality does not invoke Act 205 to avoid the consequences of its own understanding of the Plan provisions at issue, but does so to avoid the consequences of the Union's proffered contrary understanding. Furthermore, restoration of the bargaining *status quo ante* apparently works to the detriment of the Union because upon returning to the bargaining *status quo ante*, the Union stands to forfeit not only the disputed uncapped COLA increases for its early retirees, but also the entire bargained-for COLA for all retirees, at least arguably retroactive to 2000. The ramifications of the forfeiture of this nearly fifteen-year-old bargained-for benefit may not be fully appreciable at this stage in proceedings. Certainly, the Union

and individual officers have not requested this result, and presumably would find such "relief" to be undesirable. Nevertheless, the Commission's findings are clear that the parties to the relevant negotiations "did not specifically discuss how the COLA provision would apply to the Early Retirement Benefit[, and, as a result,] the 2000 Plan contains no language describing how, if at all, the COLA provision should be applied to retirees who elect the Early Retirement Benefit option." Commission F.F. No. 13. The Union proffers one understanding of the plan modification, but the Commission found that the Union had a contrary understanding based on a good faith belief concerning the proposed modification's specific operation under circumstances which were never discussed.

In my concurring and dissenting opinion in *Borough of Ellwood City, supra,* I made a number of points which I believe are also relevant here, separate and apart from the points I have already made concerning what is commanded by application of a proper standard of review of the Commission's findings, and in light of Act 205. For one, it is not desirable that we permit parties to unilaterally reap the unintended benefits of unforeseen and unaccounted-for circumstances. Further, our task may involve an obligation to protect parties from a mutual mistake in the bargaining process concerning core employment matters. Here, perhaps, the Union will insist that it made no mistake in the bargaining process and that it fully intended a plan modification that would include a significantly greater COLA for Union members who retire after a mere seven years than that which is payable to Union members who toil in public service more than three times as long. Leaving aside the obvious facial implausibility of that position, the inconvenient fact remains that the Union failed to verify that the requisite cost study reflected their understanding of how the proposed modification would apply to this scenario, which the parties never specifically discussed. I believe the approach of the Commonwealth Court below best reconciles Act 205's mandatory requirements with our obligation to protect the parties from their mistake in failing to specifically negotiate concerning a cap on COLA increases for early retirees.

Viewing the larger picture presented in this case: (1) the Union wanted a COLA for retirees; (2) the Municipality agreed to the COLA, calculated at a rate which would cap COLAs at a 15% increase for normal retirees, without any discussion of an alternate cap in increases for early retirees— leaving the parties without a meeting of the minds concerning the latter; (3) the Municipality secured a cost study as required by law in order to proceed with a plan modification adding the COLA; (4) the cost study is accurate and complete if the agreed-upon modification is as it is understood by the Municipality, but inaccurate and incomplete if the modification is as it is understood by the Union; (5) the Municipality and Union proceeded with the plan modification, adding a COLA; (6) if the Union's understanding is correct, the COLA modification is unsupported by a complete and accurate cost study and is, therefore, invalid; (7) consequently, all of the Union's retirees (early and otherwise) forfeit their bargained-for COLA under the Union's understanding of the plan modification. While securing a complete and accurate cost study concerning the proposed modification as written was the responsibility of the Municipality, the Municipality apparently stands to benefit from having failed to do so by escaping the COLA payment burden, having acted in good faith. Rather than invalidate the plan modification which included the COLA benefit, the Commonwealth Court appropriately, in my view, looked to give the Union the benefit of its bargain to the extent permissible under Act 205, *i.e.,* a plan modification to include a COLA for retirees with increases for all participants capped as calculated in the requisite cost estimate. Under the parameters established by Act 205, there was no other means by which the Commonwealth Court could allow the Union to retain the bargained-for COLA. Considering the Municipality's understanding of the plan modification and the Union's proffered interpretation of the same, the only understanding which could possibly survive scrutiny under Act 205 was the Municipality's interpretation, the only interpretation possibly supported by a complete and accurate cost study secured prior to approval of the plan modification.

In terms of interpreting the contractual language at issue, the Per Curiam Opinion concludes that the language at issue is unambiguous and must therefore be applied as written. As I have pointed out, however, application of the Plan language as understood by the Per Curiam Opinion here is a legal impossibility because Act 205 does not allow it. Contract terms do not exist in a legal vacuum, but must be construed in light of all applicable laws. *Empire Sanitary Landfill, Inc. v. Dep't of Envtl. Res.*, 546 Pa. 315, 684 A.2d 1047, 1059 (1996) ("The laws that are in force at the time parties enter into a contract are merged with the other obligations that are specifically set forth in the agreement."). "The fundamental rule in interpreting a contract is to ascertain and give effect to the intent of the contracting parties." *Crawford Cent. Sch. Dist. v. Com.*, 585 Pa. 131, 888 A.2d 616, 623 (2005). Moreover, "[t]he intention of the parties must necessarily govern in the construction of all contracts, and it will never be presumed that persons occupying a contractual relation intend that an impossible thing shall be done." *Bingell v. Royal Ins. Co.*, 240 Pa. 412, 87 A. 955, 957 (1913). Here, the Court should not presume a contractual intention to disregard and violate Act 205. It is clear that the parties intended that the Union should receive some form of a COLA benefit, and presumed that the parties intended compliance with Act 205. Under the circumstances, therefore, rather than invalidate the plan modification and strip the Union of its bargained-for COLA provisions, causing the parties to grapple with the ramifications and uncertainty that comes along with invalidating a modification some fifteen years after the fact, I would affirm the Commonwealth Court's decision, and leave the parties to bargain to resolve their misunderstanding going forward. The Commonwealth Court was correct that, as between the two proffered interpretations, only one was lawful under Act 205. The interpretation that would award a windfall, and one that is of comparative absurdity (given the greater service of those employees who do not retire early), cannot stand.

For these reasons, I respectfully dissent.

Justice EAKIN joins this dissenting opinion.